O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| DELEGATES TO THE REPUBLICAN NATIONAL CONVENTION ET AL.,<br><br>Plaintiffs,<br><br>vs.<br><br>REPUBLICAN NATIONAL COMMITTEE ET AL.,<br><br>Defendants. | Case No.: SACV 12-00927 DOC(JPRx)<br><br><br>ORDER GRANTING DEFENDANTS' MOTION TO DISMISS |

Section 1971 of Title 42 of the United States Code is part of a landmark civil rights statutory scheme, commonly referred to as the "Voting Rights Act," which Congress enacted to end the violence and discrimination that plagued minority voters in Congressman Ron Paul's home state of Texas and other parts of this country.  *See McCain v. Lybrand*, 465 U.S. 236, 243, 243 n.11 (1984); *Morse v. Republican Party of Virginia*, 517 U.S. 186, 213 (1996) ("Congress passed the Voting Rights Act of 1964 because it concluded that case-by-case enforcement of the Fifteenth Amendment, as exemplified by the history of the white primary in Texas, had proved ineffective to stop discriminatory voting practices in certain areas of the country."); *South*

-1-

*Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966) ("The Voting Rights Act was designed by Congress to banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century."); Elections, 13D Fed. Prac. & Proc. Juris. § 3576 (3d ed.) (citing 42 U.S.C. § 1971 as part of comprehensive legislation "to provide effective remedies against discrimination in the conduct of elections" that began "with the Civil Rights Act of 1957, and with broadening amendments in 1960, 1964, 1965, and 1970"). "The historic accomplishments of the Voting Rights Act are undeniable." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 201 (2009). "When it was first passed, unconstitutional discrimination was rampant and the 'registration of voting-age whites ran roughly 50 percentage points or more ahead' of black registration in many covered States." *Id.*; *see also Nixon v. Herndon*, 273 U.S. 536, 541 (1927) (lawsuit challenging Texas statute "forbid[ding] negroes to take part in a primary election").

Six years ago, Congressman Ron Paul voted against reauthorizing the Voting Rights Act.[1] Ironically, his supporters now bring this lawsuit under the very statutory scheme he tried to end.

After reviewing the moving papers and oral argument, the Court GRANTS Defendants' Motion to Dismiss (Dkt. 7), but dismisses WITHOUT PREJUDICE. Because the Court grants Defendants' Motion to Dismiss, the Court also DENIES Plaintiffs' Ex Parte Application to Expedite Trial (Dkt. 16).

## I.    Background

The gravamen of Plaintiffs' First Amended Complaint ("FAC") is that Defendants have engaged in various acts—often too vaguely described to be intelligible—that have disadvantaged Ron Paul in his quest to be nominated as the Republican Party's candidate for President at the Republican National Convention commencing on August 27, 2012.

### a.  Parties

---

[1] *See* Final Vote Results For Roll Call 374, http://clerk.house.gov/evs/2006/roll374.xml (reflecting vote on July 13, 2006).

The FAC describes the Plaintiffs as: (1) "National Delegates"; (2) "Alternate National Delegates"; and (3) "State Delegates who elected National Delegates." FAC at 24:4-19. The National and Alternate National Delegates include "Delegates duly elected but having their Certification [sic] withdrawn." *Id.* at 24:15.

The FAC describes the Defendants as: (1) the Republican National Committee ("RNC"); (2) RNC's Chairman, Reince Priebus; (3) "every State Republican Party and party Chairman within the Jurisdiction of the Ninth Circuit"; and (4) "State Republican Party Organizations participating in a Federal Election for the purpose of nominating a candidate for President of the United States and a candidate for Vice President of the United States." *Id.* at 24:15.

**b. Allegations**

While the FAC's allegations are often duplicative and unclear, they appear to be as follows:

- "Defendants have unlawfully used State Bylaws." *Id.* at 27:5-6.
- "Defendants have refused to Certify [sic] Delegates who were properly elected." *Id.* at 27:7-8.
- "[I]n almost every state in the United States[,] Defendants engaged in a scheme to intimidate and harass Delegates who were supporting a Candidate that Defendants did not approve of. This harassment included the use of violence, intimidating demands that Delegates sign affidavits under penalty of perjury with the threat of criminal prosecution for perjury as well as financial penalties and fines if the Delegate fails to vote as instructed by Defendants." *Id.* at 26:21-26.
- "Defendants have further harassed and intimidated Plaintiffs with untimely Rule changes designed to deny a quorum or to manipulate Delegates supporting a particular Candidate to be deprived of a fair election in furtherance of a scheme to deny Plaintiffs the right to vote their conscience on all ballots." *Id.* at 26:27-28, 27:1-2.
- "Defendants have altered the voting ballot results to fraudulently reflect an outcome that is inconsistent with the actual voting ballot results for the purpose of certifying a fraudulently selected slate of Delegates to support the Candidate of Defendants [sic]

choice rather than the Delegates properly elected all to prevent Plaintiffs from voting their conscience." *Id.* at 27:9-12.

- "[T]here is a systematic campaign of election fraud at State Conventions including programming a voting machine in Arizona to count Ron Paul votes as Governor Romney votes; ballot stuffing, meaning the same person casting several ballots in several State Conventions; altering procedural rules to prevent votes being cast for Ron Paul, all as acts of intimidation to prevent National Delegates from voting their conscience." *Id.* at 33:10-15.

- "Bones have been broken.  A gun has been used to threaten a Plaintiff to vote as ordered while inside of a school.  Plaintiffs have been followed. Plaintiffs have been threatened with future life-time harassment if Plaintiffs do not vote as directed. Plaintiffs have been threatened to remove their names from this lawsuit or face adverse consequences." *Id.* at 34:12-16.

The sole allegation that references a specific Defendant and specific Plaintiff appears on page 32.  There, the FAC alleges that "Plaintiff Renato D'Amico is a duly elected National Delegate from the State of Massachusetts who was unlawfully removed from the State Delegation when he refused to sign" an affidavit "presented by Defendant Republican Party of Massachusetts" requiring him to "swear[] under penalty of perjury that he would vote for Governor Romney." *Id.* at 32.  The FAC alleges that, "[i]n Massachusetts[,] at least 17 Delegates duly elected were ordered to sign" the same affidavit even though "no Party Rule . . . permits such an [a]ffidavit nor such an ultimatum, nor has said Defendant ever required such an [a]ffidavit in the past." *Id.*  Plaintiffs "request an order of this Court reinstating Plaintiff Renado D'Amico to his duly elected position as a Certified National Delegate and further requests that all Massachusetts Delegates be reinstated who were removed solely for refusing to sign the unlawful [a]ffidavit." *Id.*

### c.  Procedural history

On July 5, 2012, Defendants filed the present Motion to Dismiss.  Mot. (Dkt. 7).  Four days later, this Court denied Plaintiffs' ex parte application but explained that, if Plaintiffs

wished to file an amended complaint containing the changes outlined in the ex parte application, Plaintiffs were free to do so. *See* July 9, 2012, Order (Dkt. 10). Plaintiffs filed the FAC, with is the operative pleading in this case, on July 11, 2012. FAC (Dkt. 12). The Court then granted Defendants' request to reinstate their Motion to Dismiss because the FAC added no new factual allegations or legal theories and instead only added new Plaintiffs. *See* July 12, 2012, Order (Dkt. 13).

## II.   Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to set forth a set of facts which, if true, would entitle the complainant to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (holding that a claim must be facially plausible in order to survive a motion to dismiss). The pleadings must raise the right to relief beyond the speculative level; a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). On a motion to dismiss, this court accepts as true a plaintiff's well-pled factual allegations and construes all factual inferences in the light most favorable to the plaintiff. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The court is not required to accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678.

In evaluating a Rule 12(b)(6) motion, review is ordinarily limited to the contents of the complaint and material properly submitted with the complaint. *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir. 1994); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). Under the incorporation by reference doctrine, the court may also consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by* 307 F.3d 1119, 1121 (9th Cir. 2002).

A motion to dismiss under Rule 12(b)(6) can not be granted based upon an affirmative defense unless that "defense raises no disputed issues of fact." *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984). For example, a motion to dismiss may be granted based on an affirmative defense where the allegations in a complaint are contradicted by matters properly subject to judicial notice. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). In addition, a motion to dismiss may be granted based upon an affirmative defense where the complaint's allegations, with all inferences drawn in Plaintiff's favor, nonetheless show that the affirmative defense "is apparent on the face of the complaint." *See Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010).

Additionally, Federal Rule of Evidence 201 allows the court to take judicial notice of certain items without converting the motion to dismiss into one for summary judgment. *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994). The court may take judicial notice of facts "not subject to reasonable dispute" because they are either: "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201; *see also Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (noting that the court may take judicial notice of undisputed "matters of public record"), *overruled on other grounds by* 307 F.3d 1119, 1125-26 (9th Cir. 2002). The court may disregard allegations in a complaint that are contradicted by matters properly subject to judicial notice. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

Dismissal without leave to amend is appropriate only when the court is satisfied that the deficiencies in the complaint could not possibly be cured by amendment. *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003); *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (holding that dismissal with leave to amend should be granted even if no request to amend was made). Rule 15(a)(2) of the Federal Rules of Civil Procedure states that leave to amend should be freely given "when justice so requires." This policy is applied with "extreme liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990).

**III.   Discussion**

Defendants argue that: (1) the First Amended Complaint ("FAC") is too vague and conclusory to satisfy the pleading standard; and (2) to the extent that the FAC is intelligible, this Court should not adopt Plaintiffs' interpretation of Section 1971(b) of the Voting Rights Act because it would violate Defendants' First Amendment right of association. Plaintiffs do not substantively respond to these arguments and instead raise two procedural objections. The Court first addresses Plaintiffs' objections and then turns to Defendants' arguments.

### a. Plaintiffs' procedural objections do not address the merits of Defendants' Motion to Dismiss

Plaintiffs' Opposition opens with two arguments that this Court addresses briefly because they do not go to the merits of this case. First, Plaintiffs argue that Defendants failed to meet and confer with Plaintiffs prior to filing this Motion and in violation of Local Rule 7-3. Opp'n at 1-3. Even assuming this is true, Plaintiffs can hardly fault Defendants for failing to follow this Local Rule given that *Plaintiffs* repeatedly filed ex parte applications seeking orders from this Court without providing Defendants an opportunity to respond and in violation of Local Rule 7-19. *See e.g.*, July 9, 2012, Order (Dkt. 10) (denying Plaintiffs ex parte relief for, among other things, failure to follow Local Rule 7-19).

Second, Plaintiffs accuse Defendants' attorneys of having a conflict of interest with their clients because "[s]everal Defendants in this case are duly elected party chairmen who are open supporters of Dr. Ron Paul." Opp'n at 4. This argument fails for so many reasons, one of which is that a plaintiff can not defeat a motion to dismiss by simply casting aspersions on the defendant's attorney. Rather, a plaintiff must engage the *merits* of the motion to show that the defendant has not actually met its burden.

### b. With one exception, Plaintiffs' allegations are not sufficiently intelligible for this Court to even analyze whether they can state a claim

A court considering a motion to dismiss "can choose to begin by identifying pleadings [within the complaint] that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). In this section, the Court first explains why it will not consider at this late date the DVDs recently filed by Plaintiffs. The

Court next identifies those pleadings in the FAC that are conclusory or not sufficiently plausible. Finally, the Court concludes that only one page in the FAC contains allegations that are sufficiently intelligible for this Court to even analyze whether they can state a claim.

At the outset, the Court notes that it is profoundly difficult to discern Plaintiffs' legal theory because Plaintiffs' Opposition does not cite a single case regarding the Voting Rights Act, much less any case regarding election law or the First Amendment.  However, the FAC itself suggests[2] and at oral argument Plaintiffs confirmed that Plaintiffs bring this action under Section 1971(b) of the Voting Rights Act.  Section 1971(b) provides in relevant part that "[n]o person . . . shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to . . . vote as he may choose . . . for the office of President . . . [or] Delegates . . . at any general . . . or primary election held . . . for the purpose of selecting or electing any such candidate."  42 U.S.C. § 1971(b).[3]

### i.  The Court can not consider Plaintiffs' late-filed DVDs

---

[2] *See* FAC at 26:3-7 (quoting language from Section 1971(b)).

[3] The FAC itself implies, and Defendants do not dispute, that 42 U.S.C. § 1971(b) provides plaintiffs with a private right of action for an injunction and declaratory relief.  The Court has, on its own, found legal support for this conclusion.  *See Brooks v. Nacrelli*, 331 F. Supp. 1350, 1351-52 (E.D. Pa. 1971) (holding that, "although 42 U.S.C. § 1971(c) authorizes the Attorney General to institute an action for the United States to enjoin violations of [42 U.S.C.] § 1971(b), nevertheless a private action for violations of § 1971(b) also lies" for plaintiffs' class action seeking injunction and declaratory relief) *aff'd*, 473 F.2d 955 (3d Cir. 1973) (analyzing plaintiffs' Section 1971(b) claim); *cf. Olagues v. Russoniello*, 770 F.2d 791, 805 (9th Cir. 1985) (holding that 42 U.S.C. § 1791(b) provides no private action *for damages*, but leaving open the question of whether the statute provided a private action for equitable relief given legislative history and intent).

On a motion to dismiss, a district court may only consider additional material if it is judicially noticeable or "properly submitted as part of the complaint." *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1989). The Court reviews the Motion to Dismiss without considering the contents of several DVDs that Plaintiffs recently filed because these DVDs do not fall into either of these categories.

First, the contents of Plaintiffs' DVDs—which appear to be testimony by various Plaintiffs—are not judicially noticeable because they are neither "generally known within the territorial jurisdiction of the trial court" nor "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201; *see also Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).

Second, these DVDs were not properly submitted as part of the complaint because Plaintiffs filed them *after* Defendants moved to dismiss the FAC. Plaintiffs cannot defend against a motion to dismiss by relying on new allegations in their Opposition that are absent from the operative pleading. *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984); *Nguyen v. JP Morgan Chase Bank*, No. SACV 11-01908 DOC (ANx), 2012 U.S. Dist. LEXIS 12070, ay *9 (C.D. Cal. Feb. 1, 2012). The policy reason for this rule is two-fold. First, a court construes well-pled pleadings liberally on a motion to dismiss because the plaintiff's attorney must certify that "factual contentions have evidentiary support," and the attorney can be severely punished if this statement is later revealed to be false. *See* Federal Rule of Civil Procedure 11(b)(3). In contrast, allegations in material not attached to the complaint do not necessarily come with these enforceable promises by an attorney. Second, the purpose of a motion to dismiss is to provide the defendant with an opportunity to respond to the allegations against him; a defendant is denied this opportunity if a plaintiff can defeat a motion to dismiss by perpetually filing additional material not included in the complaint.

### ii.  The FAC is riddled with conclusory allegations lacking plausibility

As previously noted, a court accepts as true a plaintiff's *well-pled* factual allegations and construes all factual inferences in the light most favorable to the plaintiff. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The policy justification for

reading a complaint's allegations liberally is that a plaintiff often must sue before she has had the benefit of discovery and that defendants are frequently in a better position to know the details of how their acts caused the plaintiff's harm.  However, this policy justification vanishes where the harm to the plaintiff is unclear.  Thus, pleadings must raise the right to relief beyond the speculative level; a plaintiff must provide "more than labels and conclusions." *Twombly*, 550 U.S. at 555.

The following allegations use mere labels and conclusions from which the Court can not discern *what* Plaintiffs' harm is, much less *who* has done *what* to *whom*.

- "Defendants have unlawfully used State Bylaws." FAC 27:5-6.
- "Defendants have refused to Certify [sic] Delegates who were properly elected."  *Id.* at 27:7-8.
- "[I]n almost every state in the United States[,] Defendants engaged in a scheme to intimidate and harass Delegates who were supporting a Candidate that Defendants did not approve of. This harassment included the use of violence, intimidating demands that Delegates sign affidavits under penalty of perjury with the threat of criminal prosecution for perjury as well as financial penalties and fines if the Delegate fails to vote as instructed by Defendants."  *Id.* at 26:21-26.
- "Defendants have further harassed and intimidated Plaintiffs with untimely Rule changes designed to deny a quorum or to manipulate Delegates supporting a particular Candidate to be deprived of a fair election in furtherance of a scheme to deny Plaintiffs the right to vote their conscience on all ballots." FAC 26:27-28, 27:1-2.
- "Defendants have altered the voting ballot results to fraudulently reflect an outcome that is inconsistent with the actual voting ballot results for the purpose of certifying a fraudulently selected slate of Delegates to support the Candidate of Defendants [sic] choice rather than the Delegates properly elected all to prevent Plaintiffs from voting their conscience."  *Id.* at 27:9-12.
- "[T]here is a systematic campaign of election fraud at State Conventions including programming a voting machine in Arizona to count Ron Paul votes as Governor Romney

votes; ballot stuffing, meaning the same person casting several ballots in several State Conventions; altering procedural rules to prevent votes being cast for Ron Paul, all as acts of intimidation to prevent National Delegates from voting their conscience." *Id.* at 33:10-15.

- "Bones have been broken. A gun has been used to threaten a Plaintiff to vote as ordered while inside of a school. Plaintiffs have been followed. Plaintiffs have been threatened with future life-time harassment if Plaintiffs do not vote as directed. Plaintiffs have been threatened to remove their names from this lawsuit or face adverse consequences." *Id.* at 34:12-16.

These allegations are all riddled with the same error. For example, Plaintiffs' vague reference to "State Bylaws" gives this Court no inkling as to which of the 50 states and which of the millions of pages of bylaws Plaintiffs refer. Similarly, Plaintiffs' use of the passive voice renders it impossible to discern who broke the bones of whom, who pointed a gun at whom, and whether any of the more than 100 Defendants were even involved. Finally, Plaintiffs' vague allegations of voting ballot fraud occurring somewhere at sometime and apparently committed simultaneously by all "Defendants" lacks plausibility. While Plaintiffs make an oblique reference to a voting machine somewhere in Arizona, the lack of clarity in this allegation is insufficient to raise it to a level above mere speculation.

Thus, this Court does not accept these allegations as true. *See McHenry v. Renne*, 84 F.3d 1172, 1176 (9th Cir. 1996) (affirming dismissal of complaint where lower court reasoned that complaint failed to "clearly and concisely explain[] which allegations are relevant to which defendants" and noted that the "purpose of the court system is not, after all, to provide a forum for storytelling or political griping, but to resolve legal disputes").

### iii. The sole intelligible allegation is that a specific Defendant removed elected delegates who refused to vote for a particular nominee at the convention

The sole allegation that is pled with some clarity is that the Defendant Republican Party of Massachusetts removed at least 17 elected delegates from the state delegation for the national

convention because those delegates refused to sign an affidavit promising to vote for a particular nominee.  Specifically, Plaintiffs allege that "Plaintiff Renato D'Amico is a duly elected National Delegate from the State of Massachusetts who was unlawfully removed from the State Delegation when he refused to sign" an affidavit "presented by Defendant Republican Party of Massachusetts" requiring him to "swear[] under penalty of perjury that he would vote for Governor Romney."  FAC at 32.  Plaintiffs also allege that, "[i]n Massachusetts[,] at least 17 Delegates duly elected were ordered to sign" the same affidavit even though "no Party Rule . . . permits such an [a]ffidavit nor such an ultimatum, nor has said Defendant ever required such an [a]ffidavit in the past."  *Id.*  Plaintiffs "request an order of this Court reinstating Plaintiff Renado D'Amico to his duly elected position as a Certified National Delegate and further requests that all Massachusetts Delegates be reinstated who were removed solely for refusing to sign the unlawful [a]ffidavit."  *Id.*

This pleading is the sole intelligible pleading in the FAC because the Court can at least discern who did what to whom.  Thus, the Court will construe the FAC as making *only* this allegation and analyze *only* this allegation in the next section to determine whether Plaintiffs have stated a claim.

### c.  Plaintiffs fail to state a claim under Section 1971(b) of the Voting Rights Act

Defendants argue that a court order reinstating delegates would violate Defendants' First Amendment right to exclude certain people from leadership positions in their party.  Mot. 12-15. Defendants' argument appears to be that Plaintiffs' interpretation of the Voting Rights Act would violate Defendants' First Amendment right to exclude, and thus this Court should not adopt Plaintiffs' interpretation because it would render the Voting Rights Act unconstitutional.[4]

---

[4] The First Amendment limits *federal* encroachment on political parties' right to exclude.  This First Amendment right also limits *states'* encroachment on political parties' nominee selection process because the First Amendment is incorporated by the Fourteenth Amendment against the states.  *See Democratic Party of United States v. Wisconsin*, 450 U.S. 107, 122 (1981).

Recently, in *Northwest Austin Municipal Utility District No. One v. Holder*, the United States Supreme Court was confronted with a constitutional challenge to a different section of the Voting Rights Act not at issue here.  *See* 557 U.S. 193, 205 (2009) (discussing challenge to 42 U.S.C. §§ 1973b, 1973c).  The Supreme Court chose to avoid addressing the constitutional issue and instead resolved the dispute through statutory interpretation.  *Id.*  The Court did so by invoking the canon of constitutional avoidance, which instructs courts to "not decide a constitutional question if there is some other ground upon which to dispose of the case."  *Id.*; *see also Simmons v. Galvin*, 575 F.3d 24, 42 (1st Cir. 2009) (following *Northwest Austin* to avoid reaching "the serious constitutional questions which . . . would be raised were we to adopt plaintiffs' construction of the statute" because "courts, particularly in [Voting Rights Act] cases, should avoid deciding constitutional issues where statutory interpretation obviates the issue").

This Court follows the United States Supreme Court's direction in *Northwest Austin* and thus does not address the merits of Defendants' argument that Plaintiffs' interpretation of Section 1971(b) of the Voting Rights Act would be unconstitutional.  As detailed below, the Court first describes the contours of Defendants' First Amendment right to exclude.  Second, the Court describes Plaintiff's interpretation of the Voting Rights Act.  Finally, the Court concludes that no authority supports Plaintiffs' interpretation of Section 1971(b), but that that there are several indisputably constitutional *alternative* interpretations of Section 1971(b).  Because Plaintiffs' allegations do not state a claim under these alternative interpretations, the Court GRANTS Defendants' Motion to Dismiss WITHOUT PREJUDICE.

### i. Political parties have a limited right to exclude people from membership and leadership roles

---

Although Defendants' right-to-exclude argument references both the First and the Fourteenth Amendment, the latter's incorporation of the former against the *states* does not appear to be a relevant defense where, as here, Defendants appear to argue that a *federal* court's order based on Plaintiffs' interpretation of a *federal* law would violate Defendants' right to exclude.

Political parties and their members have a First Amendment right to association free from federal encroachment; this right includes the "right to exclude" people from membership or leadership roles in the party in certain circumstances. *California Democratic Party v. Jones*, 530 U.S. 567, 574, 120 S. Ct. 2402, 2408, 147 L. Ed. 2d 502 (2000) ("[A] corollary of the right to associate is the right not to associate."); *New York State Bd. of Elections v. Lopez Torres,* 552 U.S. 196, 202 (2008); *Democratic Party of United States v. Wisconsin*, 450 U.S. 107, 121 (1981). This right to exclude includes the right to "choose a candidate-selection process that will in [the party's] view produce the nominee who best represents its political platform." *Lopez Torres,* 552 U.S. at 202. It also "encompasses a political party's decisions about the identity of, and the process for electing, its leaders." *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 224, 229 (1989) ("Freedom of association means . . . that a political party has a right to identify the people who constitute the association . . . and to select a standard bearer who best represents the party's ideologies and preferences.") (quotation marks and citations omitted).

"In no area is the political [party's] right to exclude more important than in the process of selecting its nominee." *Jones*, 530 U.S. 567, 568 (2000). "That process often determines the party's positions on the most significant public policy issues of the day, and even when those positions are predetermined it is the nominee who becomes the party's ambassador to the general electorate in winning it over to the party's views." *Id*. "[B]eing saddled with an unwanted, and possibly antithetical, nominee would . . . severely transform" the party. *Id*. at 579; *see also Eu*, 489 U.S. at 231 n.21.

Of course, "[n]either the right to associate nor the right to participate in political activities is absolute." *Democratic Party of United States v. Wisconsin*, 450 U.S. 107, 124 (1981). For example, a political party's right to exclude does not protect a party's demand of ideological fealty from its members where such a demand violates other constitutional rights, such as the Fifteenth Amendment. *See Baskin v. Brown*, 174 F.2d 391, 392 (4th Cir. 1949) (holding that political party's rules, including rule in which "voting in the primaries was conditioned upon the voter[] taking an oath that he believed in social and educational separation of the races," violated the Fifteenth Amendment); *Morse v. Republican Party of Virginia*, 517 U.S. 186, 200 n.17, 228-

29 (1996) (citing *Baskin v. Brown* favorably as "in accord with the commands of the Fifteenth Amendment and the laws passed pursuant to it"); *Lopez Torres*, 552 U.S. at 203 ("These [associational] rights are circumscribed, however, when . . . , for example, the party's racially discriminatory action may become state action that violates the Fifteenth Amendment.").

The Voting Rights Act as enacted under Congress' "power to enforce the provisions of the Fifteenth Amendment." *City of Boerne v. Flores*, 521 U.S. 507, 518, 117 S. Ct. 2157, 2163, 138 L. Ed. 2d 624 (1997); *Shelby County, Ala. v. Holder*, 679 F.3d 848, 864 (D.C. Cir. 2012) ("[W]hen reauthorizing the [Voting Rights] Act in 2006, Congress expressly invoked its enforcement authority under both the Fourteenth and Fifteenth Amendments."). "[W]hen Congress seeks to combat racial discrimination in voting—protecting both the right to be free from discrimination based on race and the right to be free from discrimination in voting, two rights subject to heightened scrutiny—it acts at the apex of its power." *Shelby County*, 679 F.3d at 860; *see also City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) ("Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional."). Thus, a political parties' First Amendment right to exclude does not per se render the Voting Rights Act unconstitutional. *See Morse v. Republican Party of Virginia*, 517 U.S. 186, 214-15, 228 (1996) (rejecting political party's argument that its First Amendment right to exclude trumped 42 U.S.C. § 1973c, a different section of the Voting Rights Act not at issue in this case.).

Furthermore, election laws often impose "some burden" on a First Amendment right to associate. *Burdick v. Takushi,* 504 U.S. 428, 433 (1992). The level of scrutiny with which a court reviews the challenged law depends on its effect upon the First Amendment right. *See id.* at 434. Currently, the standard of review applied in challenges to the Voting Rights Act "remains unsettled." *Shelby County, Ala. v. Holder*, 679 F.3d 848, 859 (D.C. Cir. 2012) (noting that Supreme Court's decision in *Northwest Austin* could be perceived as a "powerful signal" that the Supreme Court would depart from the "rationality" review it previously applied in *Katzenbach*); *see also Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 204 (2009) (declining to resolve parties' disagreement "on the standard to apply in deciding whether . . .

Congress exceeded its Fifteenth Amendment enforcement power in extending the preclearance requirements" of 42 U.S.C. §§ 1973b and 1973c, Voting Rights Act sections not at issue here). However, courts attempting to determine the standard of review that applies have resolved this question "by using traditional principles of deferential review" to federal laws, including the canon of construction that such laws are entitled to a "presumption of validity." *Shelby County*, 679 F.3d at 861-62.[5]

Plaintiffs make literally no argument and cite no case law to explain what government interest their interpretation of Section 1971(b) serves. Because the American court system is an adversarial one, this Court may not make arguments on Plaintiffs' behalf. But this is not to say that more complete briefing by Plaintiffs could not elucidate a governmental interest. Indeed, in *Lopez Torres*, the Supreme Court observed that "the State can require" and courts have previously "permitted States to [undermine] 'party bosses' by requiring party-candidate selection through processes more favorable to insurgents." *See Lopez Torres*, 552 U.S. 196, 205 (2008). Justice Scalia—hardly a champion of campaign finance reform—has even conjectured that a governmental interest may exist in crafting a nominee selection process that avoids "plac[ing] a high premium upon the ability to raise money." *See id.* In addition, the Supreme Court has rejected a political party's argument that its First Amendment right to exclude allowed

---

[5] The Supreme Court has analyzed the constitutionality of the Voting Rights Act by employing rational basis review. *State of S.C. v. Katzenbach*, 383 U.S. 301, 324 (1966) ("Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting."). Outside the context of the Voting Rights Act, the Supreme Court has held that, where the burden on the party's First Amendment right is trivial, a rational relationship between a legitimate governmental interest and the law's effect will render the law constitutional. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 451 (2008). In contrast, where the burden is severe, the law must be narrowly tailored to serve a compelling state interest in order to be constitutional. *Id.*; *see also Nader v. Brewer*, 531 F.3d 1028, 1035 (9th Cir. 2008).

it to condition delegate status on payment of a $45 fee in violation of 42 U.S.C. § 1973c, which is a section of the Voting Rights Act not at issue in this case.  *See Morse v. Republican Party of Virginia*, 517 U.S. 186, 214-15, 228 (1996).

The Court included the foregoing section to explain Defendant's First Amendment right to exclude and some of its limitations.  However, the Court need not reach "the serious constitutional questions" raised if the Court were to adopt Plaintiffs' interpretation of the Voting Rights Act because "courts, particularly in [Voting Rights Act] cases, should avoid deciding constitutional issues where statutory interpretation obviates the issue."  *Simmons v. Galvin*, 575 F.3d 24, 42 (1st Cir. 2009).

> **ii.  Plaintiffs interpret the phrase "intimidate, threaten, or coerce" in Section 1971(b) of the Voting Rights Act to include a political party's conditioning of delegate status on a promise to vote for a particular nominee**

Plaintiffs appear to sue under Section 1971(b) of the Voting Rights Act.  *See* FAC at 26:3-7 (quoting language from Section 1971(b)).  This section provides in relevant part that "[n]o person . . . shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to . . . vote as he may choose . . . for the office of President . . . [or] Delegates . . . at any general . . . or primary election held . . . for the purpose of selecting or electing any such candidate."  42 U.S.C. § 1971(b).

Plaintiffs make no argument in their Opposition.  However, the facts they allege suggest that Plaintiffs believe they can state a claim under Section 1971(b) because the phrase "intimidate, threaten, or coerce" encompasses Defendant Republican Party of Massachusetts' *conditioning* of delegate status upon the putative delegate signing an affidavit promising to vote for a particular nominee where no state law or party rule expressly authorizes said Defendant's act.

> **iii.  No authority supports Plaintiffs' interpretation of the Section 1971(b) of the Voting Rights Act**

The Court has found only four dozen cases discussing Section 1971(b) of the Voting Rights Act.  None of these cases interpret the phrase "intimidate, threaten, or coerce" as broadly as Plaintiffs urge.  The Court reviews one such case, *U.S. by Katzenbach v. Original Knights of Ku Klux Klan* ("*Ku Klux Klan*"), to provide an example of an indisputably constitutional definition of the phrase "intimidate, threaten, or coerce" and to illustrate the kind of evils the Voting Rights Act was designed to encompass.  In *Ku Klux Klan*, the court found that defendants' "acts of economic coercion, intimidation, and violence directed at Negro citizens . . . for the purpose of deterring their registering to vote" violated Section 1971.  250 F. Supp. 330, 355 (E.D. La. 1965).  In *Ku Klux Klan*, defendants' "coercive tactics" included a "six men . . . wrecking crew" to punish people as young as twelve years old who were "violating Southern traditions" by, for example, patronizing facilities that "allow[ed] Negroes to use White rest rooms."  *Id.* 338-40.  Defendants went to a restaurant where "Negroes [were] seeking service" and entered "brandishing clubs, ordered the Negroes to leave and threatened to kill Sam Barnes, a member of the Bogalusa Voters League."  *Id.* at 341.  Defendants "entered [a] park and dispersed the Negro citizens with clubs, belts, and other weapons" with "the purpose of interfering with the enjoyment of the park by Negroes and white CORE workers who were . . . using the facilities for the first time on a non-segregated basis."  *Id.* at 341-42; *see also U.S. v. McLeod*, 385 F.2d 734, 741 (5th Cir. 1967) (holding that defendant county officials' "pattern of baseless arrests and prosecutions" of participants in black voter registration drive violated Section 1971(b)).

While these examples are not the *only* definitions of the phrase "intimidate, threaten, or coerce," they at least demonstrate that there are several constitutional interpretations of Section 1971(b) of the Voting Rights Act that do *not* violate Defendants' First Amendment right. Plaintiffs do not allege any acts akin to those done by defendants in cases discussing Section 1971(b).  Nor do Plaintiffs make any argument or cite any case law or legislative history regarding Section 1971(b) to explain why the phrase "intimidate, threaten, or coerce" should be extended to the act at issue here, namely, a political parties' *conditioning* of delegate status upon

the putative delegate signing an affidavit promising to vote for a particular nominee where no state law or party rule expressly authorizes that affidavit.

Given that Plaintiffs do not allege any acts akin to the cases discussing section 1971(b), the Court GRANTS Defendants' Motion to Dismiss.  In addition, because the Court grants Defendants' Motion to Dismiss, the Court also DENIES Plaintiffs' Ex Parte Application to Expedite Trial.

### d.  This holding is extremely narrow

The Court emphasizes the narrowness of its holding.  Defendants advocate a constricted interpretation of Section 1971(b) of the Voting Rights Act.  All too frequently, parties that urge a constricted interpretation of the Voting Rights Act do so to accomplish exactly that which the Voting Rights Act is designed to prevent: disenfranchisement of voters who historically have suffered discrimination.  *See e.g., Ku Klux Klan*, 250 F. Supp. 330 (E.D. La. 1965).  As numerous courts have recognized, such "discrimination in voting is uniquely harmful in several ways: it cannot be remedied by money damages and . . . lawsuits to enjoin discriminatory voting laws are costly, take years to resolve, and leave those elected under the challenged law with the benefit of incumbency."  *Shelby County, Ala. v. Holder*, 679 F.3d 848, 861 (D.C. Cir. 2012).

This Court has no desire for its holding—which is reached under the limited facts of this case and without substantive legal argument by Plaintiffs—to be refashioned into a weapon wielded by those who wish to prolong the "blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century."  *See State of S.C. v. Katzenbach*, 383 U.S. 301, 308 (1966).  There is a very real risk that those who employ discriminatory practices will use any legal argument available, including this Court's decision, to oppose future litigation brought under the Voting Rights Act.  As Congress found when it reauthorized the Voting Rights Act in 2006, "between 1982 and 2005, minority plaintiffs obtained favorable outcomes in some 653 . . . suits" brought under a different section of the Voting Rights Act than that at issue here, and these lawsuits provided "relief from discriminatory voting practices in at least 825 counties."  *Shelby County*, 679 F.3d at 868.  Between 1982 and 2004, an additional "105 successful . . . enforcement actions were brought"

under another section of the Voting Rights Act.  *Id.* at 870.  Based on this evidence and extensive additional documentation, Congress found that "serious and widespread intentional discrimination persisted" and concluded that the work of the Voting Rights Act "is not yet done."  *Id.* at 872, 873.

    To avoid this decision being misused, the Court emphasizes what this case is not.  This is *not* a case in which Defendants' conditioning of delegate status is based on a racial motive or has a disparate impact on minority voters.  This is *not* a case alleging abuse of government officials' authority.  This is *not* a case where Defendants' acts were accomplished through violence or economic coercion, given that Plaintiffs' allegations regarding broken bones and guns are inadequately pled.  Finally, this is *not* a case alleging a violation of a specific law (other than 42 U.S.C. § 1971(b)) or specific party rule, given that Plaintiffs' allegations regarding unspecified "State Bylaws" are unintelligible.  Thus, the Court's extremely narrow holding in this case leaves unscathed both the Voting Rights Act and political parties' First Amendment right of association.

## IV.    Disposition

    For the foregoing reasons, the Court GRANTS Defendants' Motion to Dismiss. However, the Court dismisses WITHOUT PREJUDICE.  The Court will afford Plaintiffs a third and final opportunity to attempt to sufficiently plead a violation of Section 1971(b) of the Voting Rights Act.  *See Schreiber Distributing Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

    Because the Court grants Defendants' Motion to Dismiss, the Court also DENIES Plaintiffs' Ex Parte Application to Expedite Trial [16].

    Plaintiffs shall file an amended complaint, if at all, on or before August 20, 2012.


    DATED:  August 7, 2012

                                              *David O. Carter*
                                    DAVID O. CARTER
                                    UNITED STATES DISTRICT JUDGE